## P. J. COOGAN, PLAINTIFF IN ERROR, vs. B. J. PARKER AND WIFE, DEFENDANTS IN ERROR.

Covenant on a lease for seven years from 1st July, 1859. The rent which had accrued up to the 1st April. 1862, had been paid, and the action was against the lessee, to recover so much of the rent as had accrued from that day until the end of the term. The defence was that the defendant had been deprived of the beneficial use and enjoyment of the premises, according to the intent of the lease, from and after the 1st April, 1862, by the casualties of war, but it was no part of the defence that the defendant had surrendered, or offered to surrender, the lease, or otherwise to rescind the contract, and it was in evidence that he used and occupied the premises, after the close of the war, in 1865, until the end of the term : *Held*, That the defence set up was insufficient to relieve the defendant from the plaintiff's claim.

The authorities reviewed, and the true doctrine applicable to the defence held to be, that where there is a substantial destruction of the subject-matter, out of which rent is reserved in a lease for years, by an act of God, or of public enemies, the tenant may elect to rescind, and on surrendering all benefit thereunder, shall be discharged from the payment of rent.

If the tenant be deprived of the beneficial enjoyment of the leased premises, according to the intent of the lease, that is a destruction of the subject-matter of the lease, within the meaning of those terms as herein used, whether there be a physical destruction of the premises or not.

To complete the defence the tenant must show that he rescinded the contract by a surrender, or offer to surrender, of all benefit therein which remained to him.

BEFORE CARPENTER, J., AT CHARLESTON, JUNE TERM, 1869.

Writ of error by the defendant below to the Circuit Court. The action was covenant on a lease brought by Benjamin J. Parker and Elizabeth A., his wife, executrix of William Greer, deceased, plaintiffs below, against Patrick J. Coogan, defendant below. The following is a copy of the lease :

STATE OF SOUTH CAROLINA, }
    CHARLESTON DISTRICT. }

This indenture made between William Greer, of the first part, and P. J. Coogan, of the second part, showeth that I, William Greer, of the first part, do hereby lease unto the said P. J. Coogan, of the second part, his heirs, executors or assigns, for the term of seven years, to take date from the first day of July, eighteen hundred and fifty-nine, the premises known as the French Coffee House, No. — East Bay, for the sum of twelve hundred and fifty dollars a year, payable quarterly. The said P. J. Coogan, his heirs, executors or assigns, of the second part, agree to put and keep the premises in good order, and to keep the pumps, privies, roof, gutter, drains, cistern, etc., in good order always. And, furthermore, that if any improvements of any kind are made,

that they are to remain on the premises; and that the said P. J. Coogan does bind himself, his heirs, executors or assigns, to the above and that the premises are to be known and used as a coffee house, or restaurant; and it is understood and agreed that if, at any time, one quarter's rent shall be in arrears or unpaid, or the said lessee transfer this lease without the written consent of lessor, the said William Greer may be at liberty to determine this lease, and repossess the said premises. And, furthermore, the said P. J. Coogan, his heirs, executors or assigns, do bind themselves to carry out faithfully the written lease.

WILLIAM GREER.   [SEAL.]<br>P. J. COOGAN.        [SEAL.]

Signed, sealed and delivered in the presence of (this first day of July, eighteen hundred and fifty-nine):

R. S. PARKER,<br>ALEX. OWENS.

The plaintiffs, by their declaration and bill of particulars, claimed the rent due from 1st April, 1862, to first July, 1866, at $312.50 per quarter, and interest.

The defendant pleaded several pleas. The third was as follows:

That the said plaintiffs ought not to have or maintain their afore-said action thereof against the said defendant, because, he says, that, before the commencement of this suit, and before the commission of said breaches in the plaintiff's declaration mentioned, to wit, on the 15th day of February, A. D. 1862, at Charleston aforesaid, in the State aforesaid, flagrant war existed, and that portion of Charleston aforesaid in which said leased premises in the plaintiffs' declaration mentioned lie was in the possession and under the control of one of the contending armies, and by virtue of the orders of the military power then and there present and acting, and in conse-quence of the casualties of war, (for which the said defendant was in no way responsible, and which he could neither resist or control,) said defendant was compelled to vacate and abandon said leased premises, and was then, and ever thereafter has been, deprived of the peaceable enjoyment thereof.

Issues were joined on all the pleas, and the jury found for the plaintiffs below the full amount of their claim.

The following bill of exceptions shows the points of law sub-mitted to this Court:

At the trial of the cause, the plaintiff, to maintain and prove the

issue on his part, gave in evidence the lease executed on the first day of July, 1859, between said William Greer, deceased, and the said defendant, Patrick J. Coogan, and that the rent of the premises in said case mentioned had not been paid, as in said lease stipulated, since the first day of April, A. D. 1862, and that the sum of six thousand and fifty-six 37-100 dollars, with interest thereon, was due thereon and unpaid, and evidence tending to prove that the defendant has never surrendered, or intended to surrender said premises; but held the same during and after the termination of the war, and up to the end of his lease.

And the defendant, to maintain and prove the issue on his part, offered evidence tending to prove that insurrection and rebellion existed in South Carolina, and that the Governor and Executive Council of the State of South Carolina, about the 10th day of February, A. D. 1862, promulgated the following order, to wit:

"STATE OF SOUTH CAROLINA,

"EXECUTIVE COUNCIL CHAMBER, February 7, 1862.

"The following resolution, by the Governor and Council, adopted at a meeting held this day, have been ordered to be published:

[EXTRACT.]

"*Resolved*, That the Commanding General of the Charleston Department is hereby authorized, in conjunction with the Mayor of the city, to close all grog-shops and prohibit the sale of all intoxicating drinks in the vicinity of the lines of fortifications now being erected in and about the city of Charleston, during the time that negroes are employed upon the same; and the said General and Mayor are further authorized to establish such regulations for effecting these purposes as may be deemed necessary by them.

"Extracts from the minutes.

"By order of the Governor and Council.

"F. J. MOSES, JR., Secretary."

That, pursuant to said order, the Commanding General of the Charleston Department of the State, in connection with the Mayor of the city of Charleston, about the middle of February, 1862, closed up and prohibited all business of the defendant at the said French Coffee House.

That, from that time forward, by virtue of said orders, and by the casualties of war, the defendant, without his default and against his will, was deprived of the possession of said premises.

17A

That, after August, A. D. 1863, until the close of the war, in April, 1865, said premises were within range, and actually repeatedly hit and greatly injured by the bombardment of Charleston by the United States forces on Morris' Island.

That, at the close of active military operations, and the surrender of Charleston, in February, 1865, said premises were in a very dilapidated condition, so much so as to be uninhabitable.

That in June, 1865, the defendant petitioned Colonel Woodford, United States Military Commander of the post of Charleston, who then had the custody and control of said premises, for permission to occupy them.

That the petition was granted, and the defendant authorized to occupy the premises, free of rent, of the United States for the time, on the express condition that said defendant would put said premises in repair.

That, pursuant to said arrangement with said military commander, the defendant entered upon and repaired said premises, expending thereon about one thousand dollars, made the premises habitable, and thenceforward occupied them till June, 1866, when defendant surrendered the premises to the plaintiff.

Defendant further offered to prove that, on July 1, 1862, he paid $312.50 rent, in full to April 1, 1862, for said premises, to William Greer, deceased, and that on that occasion said Greer and himself had a conversation as to the rent of said coffee house, when said Greer informed defendant that "while the then state of things continued, he, Greer, could hardly expect him, defendant, to pay rent."

That from that time forward till some time in 1866, rent for said premises was never demanded by said Greer or any other person.

The Court refused to admit the evidence, and instructed the jury:

That if the defendant leased the premises in 1859, as indicated by the lease of William Greer to him, for seven years, and pursuant to the lease the defendant was put in possession of the premises, then he must be held to the payment of all the rent, as stipulated, which has not been paid, with interest thereon from the time it became due.

To which refusal to admit said evidence on behalf of the defendant, and to the said instructions to the jury, the defendant then and there, and before the jury had withdrawn from the bar, did except.

*Corbin,* for plaintiff in error.

*Duryea, Cohen,* contra.

March 22, 1871.   The opinion of the Court was delivered by

WILLARD, A. J.   It is important, before considering the question peculiar to the present case, to ascertain the state of the law of South Carolina as to the liability of a tenant for years to pay rent after the destruction of the subject-matter of the lease, from causes beyond his control.   This question will be looked at apart from the effect of the covenants usually found in such leases, other than the covenant to pay rent.

It has been considered that *Bayley* vs. *Lawrence*, (1 Bay, 499,) and *Ripley* vs. *Wightman*, (4 McC., 447,) have introduced into this State a doctrine at variance with the common law, as expounded by the adjudicated cases in England, and the leading States of this country, following the common law.   So strong has this impression of the state of our local law been abroad, that it has been said that, in this respect, South Carolina follows the doctrines of the civil law. When it is considered that, both by custom and statute law, the rules and principles of the common law have been made the foun- dation of our judicial system, it will be apparent that strong neces- sity should exist before we ascribe to the Courts that decided those cases, an intention to introduce into this State principles and rules foreign to our usages and system of laws.   It is apprehended that a clear idea of the effect of these decisions, and a review of the state of the common law, on this subject, will make it apparent that no such necessity exists.

The doctrine acted upon by the Courts of this State may be stated as follows : that where there is a substantial destruction of the subject-matter, out of which rent is reserved in a lease for years, by an act of God, or of public enemies, the tenant may elect to re- scind, and on surrendering all benefit thereunder shall be discharged from the payment of rent.

*Bayley* vs. *Lawrence*, (1 Bay, 499,) is the first reported case in which this principle was applied.   The report of that case is ex- ceedingly brief, and it appears, by the Reporter's note, that it was omitted in the publication of the cases of 1792.   Why this omis- sion occurred, whether as the result of accident, or because the re- port did not sufficiently present the ground of the judgment of the Court, is not explained.   That was an action of covenant for rent, in arrear, brought on a lease of a shipyard, at Hilton Head, for ten years, dated the 6th day of June, 1774.   The defence was, that the defendant was driven off by the casualties of war and deprived of the enjoyment.   It was resolved, *per Curiam*, " that the defendant

ought to pay for the time he peaceably enjoyed the premises, but not for the time he was prevented by the casualties of war." This is all that is given to us of the facts of the case, or of the conclu-, sions of the Court. It does not appear whether the immediate cause of the defendant's being "driven off" and "deprived of the enjoyment" of the shipyard was force or fear acting upon him personally, or the destruction of the property that constituted the main value of the shipyard, as such. Nor does it appear whether or not the defendant resumed possession of the premises after the end of the hostile occupation, which must have ceased before the end of the term. We are left to inference in deducing these important facts, vital to the understanding of the authority of the case. It is reasonable to infer that the principal value of the shipyard consisted in the buildings, ways, and other conveniences for building, repairing and launching vessels. Lands convenient for such a purpose are not likely to be valuable for agricultural, nor, when remote from populous communities, for other general purposes. Nor is it to be assumed that the site, occupied by this shipyard, possessed any extraordinary or peculiar value, as compared with other lands similarly related to the waters of that extensive harbor, so as to have formed an important element of the consideration upon which the rent reserved was agreed to be paid. As a hostile force would, naturally, seek to destroy the means by which an enemy could build and repair vessels, it is to be presumed that the conveniences and appliances that constituted the principal value of the shipyard were destroyed. If these conclusions are correctly drawn, the case is distinguished from *Pollard* vs. *Schaaffer*, (1 Dallas, 210,) where it was held that the occupation of leased premises by an alien enemy was no ground for a reduction of the rent agreed on. Under this view of *Bayley* vs. *Lawrence*, its doctrine will be found fairly embraced within the statement, already made, of the ground assumed by the Courts of this State. It would be an instance of relief granted, in the nature of recision, on the ground of the substantial destruction of the subject-matter of the lease.

This doctrine was very fully drawn out in *Ripley* vs. *Wightman*, (4 McC., 447.) Colcock, J., says: "If a man lease a house for a year, and during the term it is rendered untenantable by a storm, the rent ought to be apportioned according to the time it was occupied." He places this upon the ground that "the title to the rent is founded on the presumption that the tenant enjoys the thing during the contract." The application of this privilege to the facts

of that case involved the idea that in a lease of a dwelling-house, for the purpose of a residence, when the land that supports and adjoins the house is designed to be occupied only as accessory to such residence, the use of the house for that purpose is to be regarded as the proper subject-matter of the lease, and all other matters as incidental thereto; and also that the destruction of the house, to the extent of rendering it useless as a residence, is a substantial destruction of the subject-matter of the lease. We have here the distinction upon which the determinations of the Courts of our State rest, which have been charged with carrying the law in a direction divergent from the proper course of the common law. It is involved in the question whether the actual physical destruction of the property, the usufruct of which was contemplated by the lease, is essential as ground for rescinding the lease, or whether the destruction of the possibility of an usufruct, such as was in the contemplation of the parties to the lease, is sufficient ground for such rescission. It is very clear that the latter view has been judicially settled in this State, and acquiesced in by both Legislature and people for too many years to be disturbed at this time. It must be assumed that the relations of landlord and tenant, as they exist at this day throughout the State, have been constructed upon the idea of the law thus promulgated by the highest judicial authority of the State. It remains to be seen whether this view of the law has not a higher sanction of authority and reason than the opposite doctrine.

The next case to be noticed was *Bacott* vs. *Parnell*, (2 Bail., 424,) which was decided on the authority of *Ripley* vs. *Wightman*. O'Neall, J., says of *Ripley* vs. *Wightman:* "In that case, the act of God was held a rescission of the contract." He applied the same rule in the case before the Court, holding that a contract for the hiring of a slave was ended by the death of the slave, that being ·the act of God. This same doctrine was again sanctioned in *Corley* vs. *Kleckley*, (Dud., 35,) and in *Wilder* vs. *Richardson*, (Ib., 323.)

Before examining the merits of the position assumed by the Courts of this State upon precedent and authority, it is important to ascertain whether this is in fact an open question under the English and American decisions.

As the doctrine above stated is applicable only to the case of a destruction of the premises by the act of God and the public enemies, it will be unnecessary to look into the great mass of cases,

English and American, where the injury complained of arose from
fire, either originating on the premises or adjoining them.  Among
the cases thus shut out of view are the following:  *Belfour* vs. *Wes-
ton*, (1 T. R., 310 ;) *Monk* vs. *Cooper*, (1 Ld. Raym., 1477, and
2 Strange, 763 ;) *Baker* vs. *Holtzapffel*, (4 Taunt., 45 and 18 Ves ,
115 ;) *Walton* vs. *Waterhouse*, (3 Saund., 420 ;) *Bullock* vs. *Domitt*,
(6 T. R., 650 ;) *Ld. Chesterfield* vs. *Bolton*, (Com. Rep., 627 ;)
*Leeds* vs. *Cheatham*, (1 Sim., 146 ;) *Izou* vs. *Gorton*, (35 Eng. C. L.,
198 ;) *Loft* vs. *Dennis*, (102 Eng. C. L., 484 ;) *Willard* vs. *Tillman*,
(19 Wen., 358 ;) *Hallett* vs. *Wylie*, (3 Johns., 44 ;) *Graves* vs. *Ber-
dan*, (29 Barb., S. C., 100 ; S. C., 26 ; N. Y., 498 ;) *Magaw* vs. *Lam-
bert*, (3 Penn., 444 ;) *Fowler* vs. *Bott*, (6 Mass., 63,) and *Phillips*
vs. *Stevens*, (16 Mass., 238.)

In all these cases it has been held that the destruction of leased
premises by fire, occurring through accident or negligence, does not
afford ground for relieving the tenant from the payment of rent.  It
is worthy of remark that in all these cases there is not one in
which, so far as appears by the reports, the tenant put himself upon
the distinctive ground of a right to rescind by an act of surrender.
On the other hand, *Baker* vs. *Holtzapffel* was decided on the ground
that there had been no steps taken by the tenant in order to make
a rescission effectual.  These cases are strong authority for holding
that, during the continuance of the lease, no abatement of rent can
be claimed by reason of injury to the leased premises by fire.  It has
been generally assumed, however, and perhaps not without reason,
that their effect is to deny the right of the tenant to relief in any
form in such cases.

It will not be necessary to enquire whether cases of the destruc-
tion of the subject-matter of the lease by negligent or accidental fire
are distinguishable from, or stand as exceptions to, the rule that the
destruction of the subject-matter of the lease by the act of God or
the public enemies, works a dissolution of the lease at the election
of the lessee.  If it can only be regarded as an arbitrary exception,
still strong reasons have been urged why relief should not be ex-
tended to such cases.  Loss by fire is an ordinary risk that may
fairly have been considered within the contemplation of the parties.
The exercise of prudence and care, on the part of the tenant, who
has control of the premises during the lease, may avert the danger,
or at least diminish its injurious consequences.  To throw the con-
sequences of the loss wholly on the lessor, diminishes unduly the in-
terest prompting the tenant to the exercise of that care due in his

relation to his landlord, while an unscrupulous tenant, with a hard bargain, would find himself tempted to destroy the premises secretly, in order to escape the payment of rent. These considerations are unanswerable, when the fire originates upon the premises in the possession of the tenant.

To undertake, in such cases, to draw a line between accidental and negligent fires, would be impracticable, from the nature of the cause of inquiry.

We may, also, exclude from consideration, in the present connection, a class of cases in which the relation of landlord and tenant has been modified by covenants to maintain, support and repair, and to surrender possession of the premises at the end of the term in an agreed condition. Of these, 1 Dyer, 23, is an instance. In that case one bound by his covenant to sustain and repair the banks of a water-course was held liable on his covenant for damage occurring through an extraordinary flood. In this case, although the defendant was a lessee, no question was made as to any diminished value of the leased premises ; nor was any demand for rent involved.

*Canal Nav.* vs. *Pritchard,* (6 T. R., 750,) *Bullock* vs. *Domitt,* (6 Ib., 650,) *Lord Chesterfield* vs. *Bolton,* (Com. R., 627,) *Arden* vs. *Pullen,* (10 M. & W., 321,) *Leeds* vs. *Cheetham,* (1 Sim., 146,) and *Phillips* vs. *Stevens,* (16 Mass., 238,) are all cases of this class. In all these cases the rights of the parties depended upon the force and effect of covenants to repair, and, accordingly, they have no bearing on the question under immediate consideration.

*Paradine* vs. *Jane,* (Alleyn, 26 ; Sty, 47,) and *Pollard* vs. *Schaaffer,* (1 Dallas, 210,) involve a somewhat similar principle, but do not touch the present question. In both of these cases the complaint was that the defendant had been deprived of the possession of the leased premises by an alien enemy, and not that the subject-matter of the lease had been destroyed. The thing leased remained in existence still, although the lessee had incurred the personal misfortune of losing the advantage he had anticipated from it.

*Hart* vs. *Windsor,* (12 M. & W., 66,) *Sutton* vs. *Temple,* (12 Ib., 52,) and *Smith* vs. *Marrable,* (11 M. & W., 5,) are cases in the Exchequer at variance with themselves upon the question whether there is incident to a lease an implied covenant that the premises are fit for the purpose for which they were hired. In *Hart* vs. *Windsor,* and *Sutton* vs. *Temple,* the existence of such an implied covenant was denied, while in *Smith* vs. *Marrable* the tenant was relieved on the ground of a breach of such implied covenant. It

is true that *Hart* vs. *Windsor* professes to overrule *Smith* vs. *Marrable.* Parke, B., who delivered the opinion of the Court in both of these cases, says that the decision in *Smith* vs. *Marrable* rested on *Edwards* vs. *Etherington,* (Ry. & M., 268, and 7 D. & R., 117,) *Collins* vs. *Barrow,* (1 M. & Rob., 112,) and *Salisbury* vs. *Marshall,* (4 Car. & P., 65,) and that these cases were not law. Whether this sweeping overthrow met the approval of the King's Bench, whose decisions were involved, does not appear from any case brought to notice. In *Sutton* vs. *Temple,* a different account is given by the same Court of *Smith* vs. *Marrable.* It is there said that the case in hand was distinguished from *Smith* vs. *Marrable* on the ground that in the latter case the contract was a mixed one of land and chattels, (a furnished house,) and that, while there is such an implied contract in regard to chattels, there is none in the case of land. The report of the case (in 11 M. & W., 5,) gives no such character to *Smith* vs. *Marrable.* The lease, in the latter case, is set forth, making no mention of chattels of any description, and the question came before the Court upon the charge of the Chief Baron to the jury to the effect "that, in point of law, every house must be taken to be let upon the implied condition that there was nothing about it so noxious as to render it unhabitable." Standing by themselves, these cases in the Court of Exchequer are of unsettled authority; but their weight will be still more diminished when we come to look at *Edwards* vs. *Etherington* and *Cowie* vs. *Goodwin,* (35 Eng. C. L., 162.) Whatever may be the merits of the controversy as to the implication of covenants of fitness, we are not required, at the present time, to hold the balances in its settlement—for the principle involved in these cases is clearly distinguishable from that which forms the ground of the doctrine that the destruction of the subject-matter of the lease by the act of God or the public enemies works a dissolution of the lease at the election of the tenant.

*Edwards* vs. *Etherington,* and *Cowie* vs. *Goodwin,* approach nearer to the question in hand. *Edwards* vs. *Etherington* (24 Eng. C. L., 437,) also reported under the name of *Edwards* vs. *Hethrington,* in 16 Eng. C. L., 271, was a case where the premises became uninhabitable during the term, as a consequence of natural decay. The tenant elected to rescind, and returned the key to the lessor. The Court held that he was entitled to be relieved, as he had lost the beneficial use of the premises without fault on his part.— *Cowie* vs. *Goodwin* (38 Eng. C. L., 162, 9 Car. & P., 378,) involved the same principle and received the same solution.

It is apparent that if these cases possess authority, it tends to enlarge the doctrine stated above, and places a destruction of the habitable quality of a house by natural decay, without the fault of the tenant, on the same footing as if the cause of such injury was the act of God, or of the public enemies. *Arden* vs. *Pullen*, (10 M. & W., 321,) was, also, a case of decay, though alleged to have resulted from bad original construction ; but the tenant had cove-nanted to repair, and that created a clear distinction from *Edwards* vs. *Etherington*, and *Cowie* vs. *Goodwin*.

*Graves* vs. *Berdan*, (26 N. Y., 498, S. C., 29, Barb. S. C., 100,) directly affirms the doctrine under immediate consideration. That was an action for rent of apartments in a building afterwards de-stroyed by fire. Emott, J., whose opinion, delivered in the Supreme Court, received the direct sanction of the Court of Appeals, takes ground that where the estate is gone, and the thing demised no longer exists, no rent can any longer be recovered. He applies this to the case in hand, holding that the destruction of the apartments was the total destruction of the thing leased, and concluded that the tenant ought to be discharged from the payment of rent. This conclusion was sustained on appeal. The opinion in the Court of Appeals states: "That at common law, where the interest of the lessee in a part of the demised premises was destroyed by the act of God, so that it was incapable of any beneficial enjoyment, the rent might be apportioned." This was the ground on which the judgment in the case rested. It is true the opinion branched out into collateral matter, tending to narrow down the practical value of the rule; but, so far as the case settled the law of New York, it carries it beyond the doctrine of the Courts of this State, as stated above, by extending it beyond the act of God and the public ene-mies to one of accidental fire.

*Cass* vs. *Rudale* (2 Ves., 280,) was not a case of landlord and tenant, but was a bill for a specific performance of a contract for the purchase of houses, where it appeared that, after suit brought, the houses were destroyed by an earthquake. The Court decreed a specific performance. As the present question arises out of the peculiar contract that exists between landlord and tenant, *Cass* vs. *Rudale* can throw no light upon it.

*Taverner's* case (1 Dyer, 56,) applied the principle in question, allowing the rent to be apportioned where there was a lease of land and sheep, and the sheep died during the term.

From the foregoing review of the authorities on which those rely

who have affirmed that *Bayley* vs. *Lawrence* and *Ripley* vs. *Wight-man*, run counter to the course of the common law, it will be seen that, so far as it regards adjudicated cases, there is no conflict with the principle of these cases. It is true that, in some of these cases, expressions are employed inconsistent with the application of the principle that has been made in our Courts; but the consideration of these judicial views and opinions belongs to that part of our discussion which will take into account the state of authority.

Regarding, then, the question as an open one upon the adjudicated cases in England and this country, we will proceed to consider its merits more closely.

The question is two-fold:

1st. Where there is a substantial destruction of the subject-matter out of which rent is reserved by a lease for years, by an act of God, or of the public enemies, may the tenant elect to rescind the lease, and, on surrendering all benefit thereunder, may he be discharged from the payment of rent?

2d. Whether the actual physical destruction of the property, the usufruct of which was contemplated by the lease, is essential to form a ground for rescinding the lease, or whether the destruction of the possibility of an usufruct, such as was contemplated by the parties to the lease, is sufficient ground for such rescission.

We believe it will be found that the better reason and the weight of authority lies on the side supporting the proposition advanced in the 1st question, just stated, as well as in the latter category of the 2d question, that the idea of mere physical destruction has never been prominent, and that the possibility of a beneficial enjoyment, according to the clear intent of the lease, has been made the test of the integrity of the lease. Rent is defined to be a certain yearly profit in money, provisions, chattels, or labor arising out-of lands and tenements, in retribution for the use.—3 Kent's Com., 460.

This definition, with very little difference in the form of statement, and none in its import and effect, is generally agreed upon. The existence of rent, therefore, presupposes land, and a possible usufruct, for there can be no just demand for retribution or compensation for that which does not exist. An agreement to pay rent, whether a simple contract, or a covenant in form, is controlled by the nature of rent. If the conditions under which rent accrues do not exist, there is nothing for either an agreement or a covenant to pay rent to rest upon. A corresponding definition of a lease was

given by Judge Thompson in the *United States* vs. *Gratiot*, (14 Pet., 835.) He says "the legal understanding of a lease for years is a contract for the possession and profits of land for a determinate period, with the recompense of rent." But the possession of land derives value only from its profits, immediate or prospective. The lessee for a short term ought to be regarded as contemplating immediate profits—the owner of the reversion as looking to prospective profits. The definition of rent, as we have seen, is based upon the idea of "yearly" or present profits. Where parties contract together in terms that import the relations expressed by the foregoing definitions, it is obvious that their contract ought to receive such a construction as to preserve the rights and equities lying at the foundation of such definitions. The equity of a contract is its life, springing out of the idea of a reciprocity of benefits and obligations. Hence, a contract, without a consideration, being wanting in the element of equity, is void at law. When the equity of a contract is in harmony with its terms, it is enforced at law. A contract is the law of the parties—its equity is the reason of that law, and it is not a mere figure of speech to say, that where the reason ceases the law ceases also.

On the other hand, the ordinary contract for the payment of money at a fixed time, or on a fixed contingency, must be defined in terms expressing quite a different intention. The consideration of a contract to pay money must be either a right or thing acquired, or an obligation capable, in intendment of law and by the process of law, of being turned into value. The consideration of a lease is not the possession alone of land, but possession with its profits. The lessor assumes no obligation that there shall be profits, nor can any process of law produce such profits. The basis of the consideration is, then, an expectation of profits; all that the lessee gets being a right to produce and take them if they exist. It may well be that the lessee takes all ordinary risks of loss. The real consideration is, therefore, in the nature of a power of limited control over the premises, and to take to his own use the profits. This power, to answer the ends of the lease, must be upheld during the term. It may be destroyed either by the act of the lessor or of one claiming under him or against him, by title paramount, or by the destruction of the subject-matter of the lease through some agency not embraced in the risk taken by the lessee.

In the first case, all are agreed that the tenant is entitled to relief. In the second case, the words "demise," or "let," or equiva-

lent words, import a covenant of quiet enjoyment, under which the tenant *may* have relief.—*Hart* vs. *Windsor*, 12 M. & W., 66. Why is this covenant of quiet enjoyment implied by the law from the mere fact that the contract is one of letting? Clearly because the equity demands that the power of the lessee should be upheld when he has not taken the risk of its destruction. Unless, therefore, it can be shown that the lessee has taken, subject to the risk of destruction by the act of God and the public enemies, this principle should give him relief. It is claimed that where one covenants to perform an act, it is no ground of relief that the act became impossible through the act of God or the public enemies.— *Walton* vs. *Waterhouse*, 3 Saund., 422, note *a*. If, while the covenant to pay rent continues in force, this might be an answer to the claim that performance was prevented by an act of God or the public enemy, still the covenant is subsidiary to the lease, and if the lease falls, must fall with it, for the right to rent must precede the right to enforce the covenant. The present question can, therefore, receive no solution from this principle applicable to covenants. The question, then, recurs, can the lessee, in the absence of a clear expression of such intent, be regarded as having assumed the risk of the destruction of the leased premises by the act of God or the public enemies? That such an event is to be regarded as extraordinary, and not generally to be considered as within the contemplation of parties in their ordinary dealings, must be admitted. On this question we are of opinion that the weight of authority, supported by many adjudicated cases, sustains the doctrine we have presented, and that no adjudicated case denies it, while the habits and customs of the people embrace it as one of the fixed ideas upon which their daily dealings are based.

According to Rolle's Abrid., 939, possession of the leased premises by the King's enemies does not suspend the rent, and the reason assigned is, that by express agreement the lessee is bound to pay under all risks. The case here put does not imply a destruction of the subject-matter of the lease, but a mere interruption of the lessee's enjoyment of it. Again, it is said, that if part of the leased land is overflowed by fresh water, the rent does not cease, but if overflowed by the sea, the right to rent to such part is gone. The overflowing by fresh water is not regarded as inconsistent with a several enjoyment of the land, though changed in the character and value of its profits; but the sea makes all that it covers common; hence, in this case there is an actual destruction not physical—for

the land still remains under the sea—but legal and beneficial.—Ib. 236. This is a distinct affirmance of the principle in question. *Taverner's* case, (1 Dyer, 56,) is an instance of the application of the principle in question to a lease of land and sheep, when the sheep died. The arguments against the judgment which apportioned the rent were addressed against the doctrine under consideration, nor was any distinction attempted to be drawn between leases of land alone, and mixed leases of land and chattels, as was afterward done in *Sutton* vs. *Temple.*

It must, therefore, be regarded that the principle contended for met the approbation of the Court. We have already seen that this principle was applied in *Edwards* vs. *Etherington,* and *Cowie* vs. *Goodwin,* and in these cases carried beyond the limits contended for.

The note of a decision of Lord Mansfield, referred to by Buller, J., in the case of *Belfour* vs. *Weston,* (1 T. R., 312,) has relation to a case of burning by fire, in which case he says the landlord is not obliged to rebuild; but the tenant is obliged to pay rent during the whole term, has no bearing on the present question, as we have already seen. In *Baker* vs. *Holtzapffel,* (4 Taunt., 44,) which was an action for use and occupation of premises destroyed by fire, Lord Mansfield put the decision upon the distinct ground that the defendant had made no offer to deliver up the premises. This case would lead to the conclusion that at that time it was not fully settled that a loss by fire conferred no right on the tenant to rescind. When the same parties came before Lord Elden for equitable relief, (18 Ves., 115,) he disposed of the case on the ground that there was no relief in equity in such a case beyond what the law afforded. Lord Northington, in *Brown* vs. *Quiller,* (Ambler, 619,) says : " The justice of the case is so clear that a man should not pay rent for what he cannot enjoy, and that occasioned by an accident which he did not undertake to stand to, that I am surprised it should be looked upon as so clear a thing that there should be no defence to such an action at law." This was said of the burning of leased premises by fire, and although it may have been inapplicable to the case in hand, is no mean support to the more general position contended for.

It is said in the note, at page 422 of 3 Saunders' R., (*Walton* vs. *Waterhouse,*) that if there is an express covenant to pay rent, tenant is bound to pay, though the premises be burnt or blown down. It is also said, in the same note, " and as it appears from the before-

mentioned case of *Paradine* vs. *Jane*, (Alleyn, 26,) that it is no plea, in such case, to an action of covenant for non-payment of rent, to say that the house was destroyed by the King's enemies, or that the defendant was evicted and turned out of possession by them, so it is equally no reason to say that the house was burnt down, and, therefore, he is not bound to pay rent.

The doctrine contended for does not assume that the plea here stated to have been made in *Paradine* vs. *Jane* would be good. It is not the destruction of the buildings on leased land, whether by the act of God or the public enemy, that in itself constitutes the right to relief against the covenant to pay rent; but it is such a destruction as reaches to the subject-matter of the lease, or the thing that must be regarded as the consideration of the agreement to pay rent, that authorizes the tenant to elect to rescind, and it is only when this doctrine is made effectual, by the appropriate act of the tenant, that a bar to the action of covenant is complete, which goes to the existence of the covenant. It is undoubtedly correct to say that blowing down, when caused by a tempest, stands on the same footing as destruction by public enemies; but the consequences of this admission are not necessarily such as were drawn by the learned Reporter, whose language is here given.

It will be useful to notice the remarks made by Tindal, J., in *Izou* vs. *Gorton*, (5 Bing., N. C., 501,) that "the cases referred to in the argument, in which the tenant has been allowed to withdraw himself from the tenancy, and to refuse payment of rent, will be found to be cases where there has been either error or fraudulent mis-description of the premises which were the subject of the letting, or where the premises have been found to be uninhabitable by the wrongful act or default of the landlord himself." This was said in a case of destruction by fire of leased apartments subsequently repaired by the landlord, who brought his action for rent, and was allowed to recover. Tindal cites *Baker* vs. *Holtzapffel*, as decisive of the question, which decision, as has been already stated, rested on the fact that the tenant had not offered to surrender the lease. This citation is followed by the language quoted above, which goes beyond the necessities of the case, to intimate that there was no ground for a surrender in the case in hand. That the cases referred to by Tindal are not those that have been regarded as the leading cases on this subject, is evident, from the fact that none of them answers the description given by him. By confining this remark of Tindal to cases of destruction by fire, the case then in hand, it

will escape the criticism of inaccuracy to which, upon any other construction, it would be subject.

In *Taverner's* case there appears to have been a struggle between the inclinations of the common lawyers to dispose of such cases by an arbitrary rule, recommended by its simplicity and convenience of application, on the one hand, and the force of the inherent equity and justice of the claim of apportionment on the other hand, in which the latter prevailed. This is one of the cases to which Tindal ought not to be regarded as having referred, in the language quoted above.

The enlightened spirit in which the jurists, both of the common and civil law, have dealt with this question, is set forth by Chan. Walworth in *Gates* vs. *Green*, (4 Paige, 355.) He lays it down as a principle of natural law, "that a tenant, who rents a house or other tenement for a short period, and with a view to no other benefit except that which may be derived from its actual use, should not be compelled to pay rent any longer than the tenement is capable of being used." He cites to the proposition the law of Scotland, the. Code Napoleon, the law of Louisiana and New Foundland. He also cites the authority of Puffendorf as supporting that view. He makes this judicious comment on Rutherford's Institutes, 127 : " Rutherford, in his lectures on natural law, makes a very sensible distinction between a casualty which destroys the value of the use of the property, which loss naturally falls on the lessee, and one which destroys the property itself; in which latter case .he holds that the lessee is excused from the payment of further rent." If, instead of reading " property," we read " subject-matter of the lease," we will not change the sense of the terms employed. It would be an unwarrantable use of the word " property " to confine the idea conveyed by it to the land on which a building stands when the building communicates to the lease almost the entire value and interest covered by the word property. After referring to the efforts of some of the Chancellors of England "to introduce this principle of natural law into the administration of justice in their Courts," Ch. Walworth adds: " A contrary principle, however, finally prevailed in the Equity Courts of England, as well as in the Courts of common law, and it must now be considered as settled, both in England and in this State, (New York,) that a lessee of premises, which are burned, has no relief against an express covenant to pay rent, either at law or in equity, unless he has protected himself by a stipulation in the lease, or the landlord has covenanted

to rebuild.". It is obvious that the learned Chancellor had in view the case of destruction by fire alone, as the case before him was of that class, and his statement of the point decided is in terms confined to destruction from that cause. The strength of his conviction, as to the inherent justice of this proposition advanced by him, is an assurance that, if called upon to do so, he would have restricted the decisions referred to to the exact point decided, and, in doing so, would have left unaffected the principle of natural law in its application to cases of destruction from the act of God and the public enemies.

It was this view that Judge Colcock took in deciding *Ripley* vs. *Wightman,* and to which he cites the support of 6 Bacon, 50.

A more critical notice of the New York decisions is rendered important by the fact that the authority of Chancellor Kent is cited against the doctrine here contended for. That learned Chancellor says (3 Kent's Com., 466) : "It is well settled that upon an express contract to pay rent, the loss of the premises by fire, or inundation, or external violence, will not exempt the party from his obligation to pay rent." If by the loss of the premises is meant only that which Rutherford describes as the "loss of the value of the use of the property" to the lessee, then this authority is reconcilable with all that has here been said on this subject. If, on the other hand, we read the passage from Kent as saying that the destruction of the subject-matter of the lease is not, under any circumstances, ground for rescission, then we involve the learned commentator in the inaccuracy of not being supported by the authorities on which he relies. The judicious character of his mind must convince us that he employed these words in the exact sense in which they stand ; in which case he would be read as saying that it is no ground of relief for the tenant that he has lost the benefit that he contemplated in leasing the premises. Nor would the addition of the words "by fire, inundation or external violence," compel an alteration of this reading ; for it is possible for a tenant to lose the benefit of leased premises from either of these causes without there being such a destruction of the subject-matter of the lease as to warrant a rescission.

In *Hallett* vs. *Wylie,* (3 John., 44,) a case of injury by fire, Judge Van Ness states, " that there is no case in the books where the destruction of the premises by fire has been held to excuse the tenant from the payment of the rent in an express covenant." He goes on to state that every reservation of rent in a lease is to be regarded as

having the effect of a covenant. It was on the ground peculiar to cases of loss by fire that this case was decided. We have already referred to *Willard* vs. *Tillman*, (19 Wen., 358,) a case of fire also, in which the decision of the Court is put on still narrower grounds, namely, that the lease embraced a strip of land capable of beneficial use, independently of the building burned, and that the tenant, from all that appeared, might still be in possession and use of that land. The plea in that case was held bad, as it went against the whole demand for rent. This case shows at least a disinclination to re-affirm broadly the doctrine put forth in *Hallett* vs. *Wylie. Gates* vs. *Green* we have already alluded to as having elicited the views of Ch. Walworth. In *Graves* vs. *Berdan*, (26 N. Y., 498,) also alluded to above, is an authority that where the lease is of apartments alone, their destruction by fire is ground of rescission. In the opinion of Judge Emott, in the Supreme Court, (29 Barb. S. C., 100,) it is said that if there is an express covenant to pay rent in a lease of lands, neither the destruction of buildings by fire, nor the inundation of the property by water, nor its occupation by the enemy, will exempt the party from his obligation. This is evidently an incorrect rendering of the passage above quoted from Kent, and is not supported, as broadly stated, by the authorities cited in its behalf. This inexactness did not escape the attention of the Court of Appeals, for the opinion in the latter Court, after sanctioning the conclusions of Judge Emott, is careful to say that " it may be added, that at common law, when the interest of the lessee in a part of the demised premises was destroyed by the act of God, so that it was incapable of any beneficial enjoyment, the rent might be apportioned." The ground upon which this case was decided was, that the lessee of apartments in a building occupied in part by others takes no interest in the soil, and consequently the destruction of the building would be the total destruction of the thing leased. It is said that it would be otherwise if the tenant had leased the entire building ; for in that case the land would be left, and, in respect of that, he would have to pay rent. It will not be necessary to consider whether the reasons given for this decision are the best that could be given. It would, at all events, reduce apartments in a house, as the subject of letting, to a condition expressed accurately neither by the term real nor chattel. It would be something less than an easement, although it was assumed that the easement of going upon the land to and fro in the use of the apartments would accompany it as an incident. It would also involve the idea

18A

that a lessee of the whole building would have rights and liabilities of a class different from that of the aggregate of all the tenants of its separate apartments under several leases. (See *Kerr* vs. *Merchants' Exchange*, 2 Edwards Ch., 315, and *Izon* vs. *Gorton*, 35 E. C. L., 198.) The real difficulty in *Graves* vs. *Berdan* was in reconciling the right of a tenant of apartments destroyed by fire to escape the payment of rent, while the rule was upheld by the Courts of England and New York, that a tenant living in an entire building was not relievable in case of loss from the same cause.

With the settlement of this question we have nothing to do at the present time, while the general course of the case, and the pointed concessions of the Court of Appeals, sustains the general doctrine we are attempting to elucidate.

In *Fowler* vs. *Bott*, (6 Mass., 63,) Judge Sewall says that a lease for years is a sale of the premises for the term. That, unless there is an express stipulation, lessor does not insure the premises against "inevitable accident, or any other deterioration." He also says: "The rent is, in effect, the price or purchase money to be paid for ownership of the premises during the term, and their destruction, or any depreciation of their value, happening without the fault of the lessor, is no abatement of his price, but entirely the loss of the purchaser." Again, he says that, independent of some covenant, the destruction or injury of the premises by fire, "or any other casualty," is the misfortune of the lessee, and he is not excused from paying his rent. The attempt here made to assimilate a case of sale and one of hiring, as to all their incidents and consequences, seems not only unnecessary, but liable to be carried out into consequences calculated to destroy the common law idea of the relation of landlord and tenant. Judge Evans, in *Corley* vs. *Kleckley*, (Dud., 35,) made, it is conceived, a more judicious use of the points of similarity between these two transactions, when he traced the same consequences to both, as it regarded the question of what condition of unsoundness, at the time of the contract, would warrant its rescission. This is as far as it appears safe to run the parallel. The statement placing "any other casualty" on the same footing with fire, while not essential to Judge Sewall's argument, needs to be subjected to a more careful limitation, in order to bring it within the decided cases of England, as we have already seen.

Unless something of importance has been overlooked in the foregoing citations, it cannot be doubted that, in case of substantial

destruction of the subject-matter of the lease, the tenant is entitled to rescind.

What, then, should be regarded as a substantial destruction? It is said, in Doe *ex dem. Freeland* vs. *Burt*, (1 T. R., 701,) by Ashurst, J., that "the construction of all deeds must be made with reference to the subject-matter, and it may be necessary to put a different construction on leases made in populous cities from that on those made in the country." In that case, a lease of a yard to a tenant of apartments was held not ·to carry with it vaults underneath the yard, notwithstanding the principle of the common law, that the ownership of the soil carried all above and below it. The ground of this decision was, that, construing the lease by its subject-matter, it was obvious that the parties intended otherwise.

This principle is directly applicable. If parties contract with reference to the occupation of a dwelling house, the destruction of that dwelling house is clearly the destruction of that which they had in view, and was the basis and consideration of their contract. To say that the few feet of barren land on which it stood, incapable of any production worthy of consideration, is sufficient to answer the intention of the parties, to satisfy the justice and equity of the contract, as well as its terms, is to say what no jurist has yet ventured broadly to affirm. The only difference between leases in compactly built cities and in the country is, that, in the one case, the principle is more clear and evident in its application than in the other. The ground of distinction must be the fact that the structure bears such relation, in point of fitness and value for the use contemplated by the lease, as to give rise to the conclusion that the buildings were the main element of the consideration on which the agreement to pay rent was based. Such a conclusion is in accord with the sense of justice by which the mass of the people are influenced; and one reason why questions of this character are, after all, so few in number among the reported cases, is, that the sense of justice has influenced the public mind to such an extent as to bring them to a reasonable solution without an appeal to the Courts.

It has long been felt that the application of the common law ought to yield results more in accordance with the habits and ideas of the people, in this respect, and it is apprehended that, if approached in a constructive as well as a critical spirit, its doctrines and principles will be found, in all respects, compatible with the growth and tendencies of the civilization which has been fostered by it.

The present action is for rent upon a lease, for seven years, of premises consisting of a building in the lower part of the city of Charleston, to be used as a restaurant, the lease containing a covenant to repair. The defendant, upon the trial, offered to prove that he was prevented, by the casualties of war, from using the premises for the purposes contemplated by the lease; also, that the building was so injured, by the same cause, as to be rendered uninhabitable; and, also, that the military forces of the United States took possession of the premises. This evidence was excluded by the Circuit Judge, and a verdict rendered for the plaintiff. It, however, appeared that the defendant regained possession by an arrangement with the commandant of the military force, and retained possession after the cessation of hostilities until the termination of the lease.

It is not necessary to inquire whether sufficient ground existed for a rescission, for it does not appear that the defendant took any measures to rescind the lease. It is said, in behalf of the defendant, that the possession of the premises, subsequent to the military occupation, ought to be ascribed to the consent of the military authority, and not to be considered as a holding under the lease. If, under any circumstances, a hostile military occupancy could operate to extinguish the lease, still it would be necessary for the defendant to make it to appear that such occupation was *in invitum*. For aught that appears, the defendant may have abandoned the premises, without sufficient cause, to the military force.

It is sufficient for the purposes of the present case to hold that the defendant, not having established a rescission of the lease, has shown no sufficient bar to the plaintiffs' demand.

The motion for a new trial must be denied.

*Moses*, C. J., and *Wright*, A. J., concurred.